COURT OF APPEALS
DECISION
DATED AND FILED

April 15, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2019AP573**

**STATE OF WISCONSIN**

Cir. Ct. No.  2017TP87

**IN COURT OF APPEALS
DISTRICT IV**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO E.M.C.,
A PERSON UNDER THE AGE OF 18:

A. C.-E.,

   PETITIONER-RESPONDENT,

  V.

I. M.,

   RESPONDENT-APPELLANT.

        APPEAL from an order of the circuit court for Waupaca County: VICKI L. CLUSSMAN, Judge.  *Affirmed*.

¶1     NASHOLD, J.[1]   I.M. appeals an order of the circuit court terminating his parental rights to his child, E.M.C.  I affirm.

## BACKGROUND

¶2     E.M.C. was born in September of 2013, and was nearly five years old at the time of the trial in this case.  On November 15, 2017, E.M.C.'s mother, A.C.-E., filed a petition to terminate I.M.'s parental rights to E.M.C.  The petition was amended August 13, 2018.  The petition alleged two grounds for termination, "abandonment," *see* WIS. STAT. § 48.415(1), and "failure to assume parental responsibility," *see*  § 48.415(6).  I.M. contested the petition, and the circuit court held a two-day jury trial featuring the testimony of eight witnesses (the grounds phase of the termination of parental rights proceeding).

¶3     During the trial, I.M. admitted that he failed to visit or communicate with E.M.C. for multiple periods in excess of six months, which, absent a valid "good cause" defense, would qualify as "abandonment" pursuant to WIS. STAT. § 48.415(1)(a)3. and (c)1.  Specifically, I.M. testified that he had no contact with E.M.C. between December 2013 and July 2014, and again from November 28, 2014, to October of 2016.  He also agreed that, from July 2014 through November 2014, he saw E.M.C. only twice.  I.M. testified that, during some of these time periods, he called and texted A.C.-E. to try to see E.M.C. but that she did not respond.  I.M. admitted that he did not send any cards or gifts to E.M.C. during 2015, nor did he buy anything for E.M.C. during the first four months of 2016.  I.M. also testified that, at least as of October 2016 and beyond, he was a "complete stranger" to E.M.C.  I.M.'s mother testified that she did not know why I.M. did not

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

have contact with E.M.C. from December 2013 through July 2014 and opined that I.M.'s failure to see E.M.C. in 2015 was because I.M. "didn't want to grow up." She testified that she would "scold" I.M. and that she thought it "was foolish on his part to not find a way to be closer to his daughter."

¶4     The evidence is also undisputed that I.M. did not know who E.M.C.'s doctors were, anything about E.M.C.'s medical history, whether she went to school or day care, who her best friend was, or what E.M.C.'s favorite toy, favorite color, or favorite holiday was. In addition, A.C.-E. testified that, from November of 2014 to October 2016, I.M. failed to provide financial support, gifts, or other support, with the exception of buying diapers once. A.C.-E. further testified that at no time prior to her filing her November 2017 termination of parental rights (TPR) action did I.M. ever ask her about E.M.C.'s well-being, even when A.C.-E. informed I.M. that E.M.C. was sick with a high temperature. In addition, the court admitted a letter from A.C.-E.'s physician stating that I.M. had not attended any of A.C.-E.'s prenatal appointments or any well-child or sick-child appointments after E.M.C.'s birth.

¶5     In June of 2014, I.M. sought to initiate paternity proceedings and on June 20, 2014, the State of Wisconsin filed a paternity action on I.M.'s behalf. However, in an order filed August 1, 2014, the court granted the State's motion to dismiss in response to A.C.-E. filing a "good cause" petition, in which she stated that she feared I.M. Attached to the petition were letters from two other women, including her cousin (who is discussed below), stating that I.M. had been abusive to them. It is also undisputed that I.M. retained a private attorney and on June 10, 2015, filed a petition to establish paternity, custody, and placement. I.M. was eventually found to be the father and was granted visitation rights.

¶6      Scheduled visits began on October 29, 2016, and were scheduled to occur for a two-hour period every Saturday at the play area of a shopping mall and at a public library.  A.C.-E. testified that, during these visits, I.M. never interacted in any way with E.M.C.  A.C.-E. began recording the visits, and the videos were shown to the jury.  In the videos, I.M. does not acknowledge E.M.C. in any way.  I.M. admitted during the trial that he did not interact with E.M.C.[2] at the supervised visits at either the mall or the library but stated that it was because A.C.-E. failed to introduce him to E.M.C., that A.C.-E. often brought a laptop or other family members along, including her cousin who had accused him of sexual assault, and that he felt uncomfortable interacting with E.M.C. because he was a "complete stranger to her."  As captured on video, I.M. did play with a little boy who I.M. testified he did not know.  The video showed that, although E.M.C. stood near the boy and right in front of I.M., I.M. did not acknowledge her and instead spent between 15 and 20 minutes of his two-hour supervised visit playing with the boy.  A.C.-E. testified that I.M. never explained to her why he refused to interact with E.M.C. and that I.M.'s ex-girlfriend told her that the only reason he was doing "this" was to make A.C.-E. miserable.  I.M. admitted that he never brought any toys or any activities to do with E.M.C. at the visits.

¶7      Both I.M. and A.C.-E. cancelled some of the scheduled visits for various reasons.  In the summer of 2017, A.C.-E. cancelled several visits in advance, in part because, as she informed I.M., she was due to have her second child.  On September 12, 2017, I.M. filed a motion to show cause why A.C.-E. should not be

_____

[2] I.M. testified that he sometimes tried to get E.M.C.'s attention by smiling or waving at her, or whispering her name, but that he did not get anywhere with that.  He also acknowledged that such actions were "probably not" captured in any of the videos.

4

held in contempt regarding the visitations. However, because A.C.-E. filed the TPR action in November 2017, the contempt motion was not decided.

¶8 At trial, I.M. attempted to establish that he had a legally cognizable reason for not having been more involved in E.M.C.'s life. On this point, I.M. suggested that A.C.-E. interfered with his attempts to see E.M.C. by not responding to his calls or texts requesting to see E.M.C., failing to introduce E.M.C. to I.M., and bringing other people to the scheduled visitations. I.M. introduced text messages between himself and A.C.-E. The texts show that from December 3, 2014, through September 4, 2015, I.M. attempted to set up visits with E.M.C. for either himself or his parents on only five days. In some of the texts, A.C.-E. agrees or suggests an alternative time, while other texts show that she occasionally did not respond to his requests.

¶9 A.C.-E. offered a narrative contrary to I.M.'s assertions that his lack of contact with E.M.C. was due to her interference. She testified that, aside from the scheduled visits starting in October 2016, I.M.'s attempts to see E.M.C. were minimal; that she had never refused I.M. the opportunity to visit with E.M.C.; and that, when visits occurred, I.M. did not interact with E.M.C. and left many visits early. A.C.-E. also testified that she was afraid of I.M. and that I.M. used requests to see E.M.C. as a pretext for trying to have sexual relations with A.C.-E. rather than to interact with E.M.C.

¶10 Ultimately, the jury found that A.C.-E. had established both grounds for termination.[3] Following the trial, the circuit court held a dispositional hearing

---

[3] One of the twelve jurors dissented on the issue of whether there was good cause for I.M.'s failure to visit E.M.C. during the relevant time periods. Two jurors, including the one who dissented on good cause, dissented on the issue of whether I.M. had failed to assume parental responsibility.

and concluded that it was in E.M.C.'s best interests to terminate I.M.'s parental rights. On November 12, 2018, the circuit court filed a written order terminating I.M.'s parental rights.

¶11     Following the circuit court's order, I.M. filed a notice of intent to pursue postdisposition relief. I.M. subsequently filed a postdisposition motion requesting a fact-finding hearing to reconstruct unrecorded sidebars and for a new trial based on ineffective assistance of counsel. On November 13, 2019, the circuit court held a hearing on I.M.'s postdisposition motion. On December 12, 2019, the circuit court issued a written order denying I.M.'s motion. I.M. appeals the order terminating his parental rights.

## DISCUSSION

¶12     I.M. raises three primary issues on appeal. First, he challenges evidence and argument introduced by A.C.-E. that he contends impermissibly commented on E.M.C.'s best interests during the grounds phase of the TPR proceeding. Second, I.M. challenges the circuit court's admission of what he characterizes as other acts evidence. Third, he contends that his counsel was ineffective for failing to make a hearsay objection to a letter from a physician introduced at trial, which stated that I.M. had not attended any prenatal or postnatal appointments for E.M.C. I discuss these arguments below, setting forth additional relevant facts as necessary.

### I.  TPR Standards

¶13     TPR proceedings are divided into two parts:  the grounds phase and the dispositional phase. ***Waukesha Cty. Dep't of Soc. Servs. v. C.E.W.***, 124 Wis. 2d 47, 60, 368 N.W.2d 47 (1985); *see* WIS. STAT. § 48.424; *see generally* ***Steven V.***

*v. Kelley H.*, 2004 WI 47, ¶¶21-27, 271 Wis. 2d 1, 678 N.W.2d 856 (discussing the involuntary TPR process). During the grounds phase, the petitioner must prove by clear and convincing evidence that at least one of the statutorily enumerated grounds for the termination of parental rights exists. *Steven V.*, 271 Wis. 2d 1, ¶24; *see* WIS. STAT. § 48.415. If a petitioner proves one or more of the grounds for termination by clear and convincing evidence, "'the court shall find the parent unfit.'" *Steven V.*, 271 Wis. 2d 1, ¶25 (quoted source omitted).

¶14 In this case, as previously discussed, A.C.-E. alleged two grounds for terminating I.M.'s parental rights: abandonment and failure to assume parental responsibility. *See* WIS. STAT. § 48.415(1) and 48.415(6). As relevant here, a petitioner can show that the parent has abandoned the child if "[t]he child has been left by the parent with any person, the parent knows or could discover the whereabouts of the child and the parent has failed to visit or communicate with the child for a period of 6 months or longer." *See* § 48.415(1)(a)3. The defending parent has an affirmative defense to this ground if the parent shows "good cause" for having failed to communicate with or visit the child during the relevant time period. *See* § 48.415(1)(c).

¶15 The failure to assume parental responsibility ground is established by showing that the parent has not had a "substantial parental relationship" with the child. WIS. STAT. § 48.415(6)(a). A "substantial parental relationship" is defined as

> acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person has expressed concern for or interest in the support, care or well-being of the child, whether the person has neglected or refused to provide care or support for the child

> and whether, with respect to a person who is or may be the father of the child, the person has expressed concern for or interest in the support, care or well-being of the mother during her pregnancy.

WIS. STAT. § 48.415(6)(b).

¶16    If the petitioner establishes at least one of the grounds for the involuntary termination of the parent's rights, then the court "shall find the parent unfit" and the TPR proceedings move into the dispositional phase. *See Steven V.*, 271 Wis. 2d 1, ¶¶24-27.  During the dispositional phase, the court must decide whether it is in the "best interests" of the child to terminate the parent's rights. *Id.*, ¶27; WIS. STAT. § 48.426(2).  The outcome of the dispositional phase is not predetermined by the outcome of the grounds phase, and the court may conclude that termination of a parent's rights is warranted or unwarranted. *See Sheboygan Cty. DHHS v. Julie A.B.*, 2002 WI 95, ¶28, 255 Wis. 2d 170, 648 N.W.2d 402.  In line with this bifurcated structure, "the best interests standard is confined to the dispositional phase ... at the [grounds phase], the best interests of the child are not to be considered." *Door Cty. DHFS v. Scott S.*, 230 Wis. 2d 460, 468, 602 N.W.2d 167 (Ct. App. 1999).

*II.  Best Interests Evidence and Argument*

¶17    Prior to the grounds phase, I.M. filed a motion in limine, asking the circuit court to prohibit A.C.-E. and the guardian ad litem from "introducing any evidence, expressing any opinions, or making any reference to the best interests of the child."  The circuit court denied the motion with respect to the best interests of the child, reasoning that, because there was a standard jury instruction specifically instructing the jury not to consider the best interests of the child, the court need not exclude such evidence or argument at that time. *See* WIS JI—CHILDREN 301.

¶18 On appeal, I.M. argues that the circuit court's denial of his motion in limine was erroneous because it allowed A.C.-E. to introduce evidence and argument that I.M. asserts was solely relevant to E.M.C.'s best interests, contrary to case law establishing that the best interests of the child cannot be considered at the grounds phase. In the alternative, I.M. argues that, if this court determines that the motion in limine was insufficient to preserve his objections and that objections were required as the evidence and arguments arose, then: (a) his trial counsel was deficient for failing to object during presentation of the evidence and arguments; or (b) a new trial should be ordered in the interest of justice. I assume, without deciding, that the motion in limine preserved the issue and, therefore, do not reach I.M.'s arguments in the alternative.

¶19 The specific evidence that I.M. argues falls into the "best interests" category consists of: (a) 19 photographs showing E.M.C. with A.C.-E. and members of her family, including A.C.-E.'s husband and their child (E.M.C.'s younger sibling); (b) testimony from A.C.-E. describing the photographs; and (c) testimony from A.C.-E. that E.M.C. thinks of A.C.-E.'s husband as her father. I.M. also challenges A.C.-E.'s counsel's statements during opening argument that "we're here about [E.M.C.], that's what this case is really about" and that E.M.C. is a "bright, precocious little girl," as well as the A.C.-E.'s counsel's statement during closing argument that "That's the father right there. That's the person that's been the father for [E.M.C.]," referring to A.C.-E.'s husband. I.M. argues that this evidence and argument was relevant solely to E.M.C.'s "best interests" and was therefore impermissible at the grounds phase of the TPR proceeding.

¶20 This court reviews a circuit court's decision to admit or exclude evidence under an erroneous exercise of discretion standard. *See Martindale v. Ripp*, 2001 WI 113, ¶28, 246 Wis. 2d 67, 629 N.W.2d 698. "An appellate court will

9

sustain an evidentiary ruling if it finds that the circuit court examined the relevant facts; applied a proper standard of law; and using a demonstrative rational process, reached a conclusion that a reasonable judge could reach." *State v. Sullivan*, 216 Wis. 2d 768, 780-81, 576 N.W.2d 30 (1998). When a circuit court fails to delineate the factors that influenced its discretionary decision, "appellate courts independently review the record to determine whether it provides a basis for the circuit court's exercise of discretion." *Id.* at 781. "We look for reasons to sustain a trial court's discretionary decision." *Farmer's Auto. Ins. Ass'n v. Union Pac. Ry. Co.*, 2009 WI 73, ¶32, 319 Wis. 2d 52, 768 N.W.2d 596.

¶21     In this case, the circuit court did not provide a detailed analysis for allowing in the evidence at issue here. However, an independent review of the record shows that the evidence and argument at issue did not constitute an improper invocation of E.M.C.'s best interests under relevant case law.[4]

¶22     I.M. first relies on *Steven V.* This case is not on point. First, *Steven V.* does not address the type of evidence and comments at issue here. Relevant to this case, *Steven V.* holds only that, although the "consistent legislative objective throughout the Children's Code" is "'the best interests of the child'" in TPR cases, the best interests of the child do not "'prevail'" until the dispositional phase, "at

---

[4] I.M.'s contention in the circuit court and on appeal is that admission of the evidence and argument at issue violated precedent holding that the best interests of the child standard is confined to the dispositional phase and should not be considered at the grounds phase. However, to the extent I.M. also means to assert a more general relevancy argument with respect to the evidence, he does not develop that argument and it may be rejected on that ground. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992). Nevertheless, I further conclude that the evidence regarding A.C.-E.'s husband's relationship with E.M.C. was relevant to the issues of abandonment and failure to assume parental responsibility in that it tended to show that I.M. had failed to be present in E.M.C.'s life in the way that a father should and that, as a result, E.M.C. did not know I.M. and thought of someone else as her father. *See State v. White*, 2004 WI App 78, ¶14, 271 Wis. 2d 742, 680 N.W.2d 362 (relevancy "is not a high hurdle; evidence is relevant if it 'tends to cast any light' on the controversy" (quoted source and internal quotation marks omitted).

which the child's best interests are paramount." ***Steven V.***, 271 Wis. 2d 1, ¶26.  This language does not assist I.M. because it was clear in this case from the jury instructions, the special verdict form, and counsels' arguments that the jury's duty was to determine whether I.M. had abandoned E.M.C. or failed to assume parental responsibility for her, and that the jury should not consider the best interests of the child.

¶23    Notably, consistent with WIS JI—CHILDREN 301, the circuit court instructed the jury that "[c]onsideration of the best interest of the child is a matter for the Court in proceedings which will be conducted in the future, it is not a consideration for the jury."  The court further instructed the jury regarding the requirements for finding abandonment and failure to assume parental responsibility. Jurors are presumed to follow jury instructions.  *See **State v. Grande***, 169 Wis. 2d 422, 436, 485 N.W.2d 282 (Ct. App. 1992).  Further, not once did either A.C.-E. or the guardian ad litem refer to the "best interests" of the child.  Instead, they repeatedly focused on the allegations of abandonment and failure to assume parental responsibility.  In addition, the special verdict form that was required to be completed by the jury and the arguments by the parties made it clear that the issues for the jury were to whether I.M. abandoned E.M.C. or failed to assume parental responsibility.

¶24    The other three cases upon which I.M. relies are equally unavailing. ***C.E.W.*** addressed whether the guardian ad litem was permitted to make peremptory strikes or present arguments to the jury; it did not address evidence or argument similar to that complained of here.  *See **C.E.W.***, 124 Wis. 2d at 62.  In concluding that the guardian ad litem was allowed to exercise peremptory challenges and make arguments to the jury during the grounds phase (also known as the fact-finding hearing), the court noted that "the best interests of the child standard does not apply

to the fact finding hearing" and that the guardian ad litem could not "invoke the best interests of the child in statements to the jury."  *Id.* at 64, 70.  As stated above, in this case neither the guardian ad litem nor A.C.-E. applied or invoked the best interests of the child standard.

¶25   ***D.B. v. Waukesha County Human Services Department***, 153 Wis. 2d 761, 451 N.W.2d 799 (Ct. App. 1989),[5] addressed whether the court improperly introduced the guardian ad litem to the jury "as the attorney appointed to represent J.A.B.'s 'best interests.'"  *Id.* at 764.  Relying on ***C.E.W.***, the appellant in ***D.B.*** argued that such statements improperly injected into the fact-finding proceedings the best interests of the child standard.  ***D.B.***, 153 Wis. 2d at 769.  This court disagreed, concluding that "***C.E.W.*** does not place restrictions upon the *court's* conduct toward the guardian ad litem; it restricts the *guardian ad litem's* conduct."  *Id.* at 770.  The ***D.B.*** court further stated that, even if ***C.E.W.*** were meant to be more broadly read, the circuit court "did not instruct the jury to consider or determine the best interest of the child.  Rather, it simply explained to the jury at the outset what role the guardian ad litem plays in the proceedings."  ***D.B.***, 153 Wis. 2d at 770.  The court further held that "such an introduction is not only informative, it is desirable," and "is not error."  *Id.*

¶26   The final case I.M. relies on, ***Scott S.***, not only fails to support I.M.'s position but actually cuts against it.  In ***Scott S.***, this court rejected the appellant's argument that a new trial was warranted due to the following statements from the guardian ad litem during arguments to the jury:  "I believe in the *best interests of that little girl* Kristeena, that she is entitled to have you look very carefully and answer -- these questions in the way that is absolutely clear from the testimony

---

[5] I.M. refers to the name of this case as ***In the Interest of J.A.B.***

today," and "I am here because my mission is to try to protect Kristeena's ... best interests, to try and help you understand what is in the best interests of Kristeena ...." *Scott S.*, 230 Wis. 2d at 468. Unlike in the instant case where E.M.C.'s "best interests" were not mentioned, in *Scott S.* the arguments in question specifically referred to the "best interests" of the child, and did so more than once. Nevertheless, this court concluded that the arguments did not warrant a new trial, thereby undercutting I.M.'s argument here. Even further undermining I.M.'s position is this court's conclusion that "[o]nly when the court or the GAL instruct the jury that it should consider the best interests of the child is there reversible error." *Id.* at 469. Here, neither the court nor the guardian ad litem instructed the jury that it should consider E.M.C.'s best interests. Therefore, under *Scott S.*, there is no reversible error.[6]

¶27     Finally, I conclude that, in the context of the entirety of A.C.-E.'s opening and closing arguments and the evidence of abandonment and failure to assume parental responsibility set forth above, any error in allowing the evidence and argument was harmless, particularly given that the jury was specifically instructed not to consider E.M.C.'s best interests. *See Martindale*, 246 Wis. 2d 67, ¶30 (erroneous ruling on the admission of evidence is subject to a harmless error analysis); *Evelyn C.R. v. Tykila S.*, 2001 WI 110, ¶28, 246 Wis. 2d 1, 629 N.W.2d 768 ("If the error at issue is not sufficient to undermine the reviewing court's confidence in the outcome of the proceeding, the error is harmless."). With regard

---

[6] I.M. incorrectly argues that this language from *Door Cty. DHFS v. Scott S.*, 230 Wis. 2d 460, 602 N.W.2d 167 (Ct. App. 1999), is simply an "unfortunate paraphrase of a passage in [*D.B.*]." Although the language may be "unfortunate" from I.M.'s standpoint, it is nevertheless precedent. Likewise unconvincing is I.M.'s assertion that this language represents an impermissible modification of *D.B. v. Waukesha County Human Services Department*, 153 Wis. 2d 761, 451 N.W.2d 799 (Ct. App. 1989), in violation of *Cook v. Cook*, 208 Wis. 2d 166, 190, 560 N.W.2d 246 (1997). Instead, the language at issue is simply a reasonable interpretation of *D.B.*

to abandonment, the evidence showed that I.M. had no contact with E.M.C. for two periods of time that were each over six months, from December 2013 to July 2014, and from November 28, 2014, through October 29, 2016. With respect to I.M.'s good cause defense and the allegation that he failed to assume parental responsibility, the record contains overwhelming evidence that, despite bringing the two court proceedings to establish paternity and visitation, I.M.'s expressions of support and care for E.M.C. were minimal, as were his efforts at seeing E.M.C. or interacting with her in any meaningful way.

### III. Evidence of Sexual Misconduct and Domestic Abuse

¶28     Prior to trial, I.M. filed a motion in limine to exclude any mention of acts of domestic or sexual abuse and any evidence regarding I.M. being called a "sex addict" by an ex-girlfriend. A.C.-E. responded that the "sex addict" and sexual misconduct evidence was relevant to show that I.M.'s visits with E.M.C. and A.C.-E. were not actually to spend time with E.M.C., but rather to have sex with A.C.-E. A.C.-E. also asserted that both the domestic and sexual abuse evidence was relevant to respond to I.M.'s assertions that A.C.-E. was insufficiently responsive to his requests to see E.M.C., in that the evidence showed that A.C.-E. was fearful of him. The circuit court declined to categorically exclude the evidence, stating:

> I think as far as the purpose of the visits and the reason for the visits, that is admissible evidence and I will allow that to be explored through the testimony. If there are any—since this is somewhat vague—if there are any specific objections as they come up, I'll rule on them. But I think certainly the reason for the visits is relevant to this case and I will allow that to be introduced.

¶29     During trial, I.M. objected to some of the evidence that he now argues was improperly admitted but did not object to other evidence. On appeal, I.M. does not assert that his trial counsel was ineffective for failing to object; he instead argues

that the objections are preserved for review by his motion in limine. Assuming without deciding that the motion in limine preserved I.M.'s objections, I conclude that the circuit court did not erroneously exercise its discretion in admitting the evidence at issue and that any error was harmless.

¶30    I.M. challenges admissibility of the following evidence:

- A.C.-E.'s testimony that, while she was three or four months pregnant with E.M.C., I.M. told her in response to the neighbors being loud that he thought it was funny that the fathers were out drinking and doing cocaine while the mothers stayed at home with their children. He told A.C.-E. that their relationship would be like that when E.M.C. was born, and when A.C.-E. challenged this statement, I.M. pushed A.C.-E. against the wall, choked her, and told her not to talk back to him.

- A.C.-E.'s testimony regarding an incident that took place after E.M.C. was born, when I.M. and A.C.-E. were still dating, which A.C.-E. described as follows. During childbirth, A.C.-E. had an episiotomy and received stiches as a result. Her doctor told her to refrain from sexual intercourse for six weeks while the injuries healed. About four weeks after E.M.C.'s birth, I.M. came over to see E.M.C. and A.C.-E. Instead of spending time with E.M.C., I.M. made sexual advances towards A.C.-E. A.C.-E. told I.M. that she would not have sex with him, and that she could not have sex for six weeks. However, despite A.C.-E. telling I.M. no, I.M. pulled down A.C.-E.'s shorts and had sex with her. A.C.-E. broke off their relationship following this incident.

- Testimony about an incident involving A.C.-E.'s cousin, L.B., in which, during a family game night hosted at A.C.-E.'s mother's house, L.B. came out of the bathroom in the middle of the night, whereupon I.M. pushed L.B. back into the bathroom, tried to put his hands down her pants, kiss her, and told her, "Come on, let's do it." L.B. refused I.M.'s request and ran up the stairs towards her room. I.M. followed L.B. up the stairs, touching L.B.'s buttocks and grabbing her along the way. L.B. got into her room and closed and locked the door behind her. L.B. told A.C.-E. about the incident the next morning.

- Evidence in the form of a Facebook message to A.C.-E. from I.M.'s ex-girlfriend, B.O., in which B.O. states that I.M. is a "sex addict" and testimony from B.O. and A.C.-E. regarding the message.

¶31 As a preliminary matter, I note that I.M. characterizes the evidence he challenges as "other acts" evidence under WIS. STAT. § 904.04(2) and states that it is therefore subject to the analysis set forth in *Sullivan*, 216 Wis. 2d 768.[7] However, although I.M. sets forth the *Sullivan* standards at the beginning of his argument section, he argues only that the evidence was not relevant under WIS. STAT. § 904.01, and was unfairly prejudicial under WIS. STAT. § 904.03. I therefore only address these relevancy and unfair prejudice arguments.

---

[7] With the exception of testimony regarding A.C.-E.'s cousin, it is questionable whether the conduct at issue constitutes "other acts" evidence as "other acts" are "'crimes, wrongs, or acts' that occurred at some time and place *other* than the event being litigated." *See State v. Payano*, 2009 WI 86, ¶53 n.8, 320 Wis. 2d 348, 768 N.W.2d 832 (quoting 7 DANIEL BLINKA, WISCONSIN PRACTICE SERIES: WISCONSIN EVIDENCE § 404.1, at 145-46 (3d ed. 2008)). However, this issue need not be decided.

## A. Relevancy

¶32    Relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." WIS. STAT. § 904.01. As stated, this court reviews a circuit court's decision to admit or exclude evidence under an erroneous exercise of discretion standard. *See **Martindale***, 246 Wis. 2d 67, ¶28. For the reasons below, I.M. has failed to establish that the circuit court erroneously exercised its discretion.

¶33    First, the evidence regarding I.M. pushing and choking A.C.-E. while she was pregnant was relevant to the issue of whether I.M. failed to assume parental responsibility, which is established by showing that the parent has not had a "substantial parental relationship" with the child. *See* WIS. STAT. § 48.415(6)(a). In evaluating whether a "substantial parental relationship" exists, the court may consider "whether, with respect to a person who is or may be the father of the child, the person has expressed concern for or interest in the support, care or well-being of the mother during her pregnancy." WIS. STAT. § 48.415(6)(b). Pushing A.C.-E. up against the wall and choking her when she was pregnant with their child is relevant to whether I.M. expressed concern for A.C.-E.'s support, care or well-being.

¶34    Second, the sexual misconduct and domestic abuse evidence was relevant to the issues of whether I.M. had good cause for abandoning E.M.C. and whether I.M. failed to assume parental responsibility. As previously discussed, I.M. admitted that he had no contact with E.M.C. between December 2013 and July 2014, and again from November 28, 2014, through October 29, 2016. He further admitted that, from July 2014 through November 28, 2014, he only had two visits with

17

E.M.C. However, I.M. also testified that A.C.-E. had frustrated his attempts to become involved in E.M.C.'s life by not responding to his requests to see E.M.C. or by not being available to meet. I.M.'s attorney argued that the alleged interference provided "good cause" for excusing the periods of abandonment and justification for his lack of parental responsibility.

¶35    A.C.-E. testified that she never "refused" any of I.M.'s requests to see E.M.C., but that also she was afraid of I.M. A.C.-E.'s position was that I.M. was not genuinely interested in parenting E.M.C. and was using requests to see E.M.C. as a pretext for a chance to see A.C.-E. with the hope of having sex with her. The evidence of domestic and sexual abuse was relevant in that it explained why A.C.-E. may have been less than fully responsive to I.M.'s requests to see E.M.C., namely, out of fear of I.M., which in turn undermines I.M.'s good cause defense to abandonment and supports A.C.-E.'s allegation of failure to assume parental responsibility.

¶36    I.M. counters that evidence supporting A.C.-E.'s fear of I.M. was not relevant because A.C.-E. testified that she always cooperated with I.M.'s requests to see E.M.C. I.M.'s argument is that if A.C.-E. claims that she always cooperated, then A.C.-E. cannot simultaneously offer evidence that she did not cooperate out of fear. However, the jury was not required to accept A.C.-E.'s statements that she did not impede I.M. from visiting E.M.C. "The function of the jury is to decide which evidence is credible and which is not and how conflicts in the evidence are to be resolved." *State v. Poellinger*, 153 Wis. 2d 493, 503, 451 N.W.2d 752 (1990); *see also State v. Perkins*, 2004 WI App 213, ¶15, 277 Wis. 2d 243, 689 N.W.2d 684. The jury was therefore free to credit as much or as little of A.C.-E.'s and I.M.'s testimony as it saw fit. Thus, to the extent that there was a conflict either within A.C.-E.'s own testimony, or between A.C.-E.'s and I.M.'s testimony, it was the

jury's job to resolve the conflict. By extension, despite her testimony and arguments to the contrary, the jury could have reasonably concluded that A.C.-E. impeded I.M.'s attempts to see E.M.C., making evidence about why she did so relevant..

¶37 Further, the evidence related to I.M.'s sexual conduct was relevant to show that I.M.'s efforts to meet with A.C.-E. and E.M.C. were pretextual, namely, for the purpose of having sex with A.C.-E., rather than to actually interact with and care for E.M.C. In showing that I.M. was not interested in seeing and spending time with E.M.C. but was instead motivated to get together with A.C.-E. to have sex with her, the sexual conduct evidence undermined I.M.'s good cause defense to the abandonment allegation and bolstered A.C.-E's allegation of failure to assume parental responsibility.

¶38 I.M. argues that the evidence that I.M. sought to have a sexual relationship with A.C.-E. was not relevant because "[p]eople can be parents and sexual partners" and "the parent's *motive* for assuming a parental role is irrelevant to statutory grounds for termination." This argument misses the mark because the evidence was not introduced to show that I.M. had a motive for "assuming a parental role," but to show that he assumed no parental role. The evidence supported A.C.-E.'s claims that I.M. used requests for child visits as a ruse to try to have sexual encounters with A.C.-E. and that, during his visits, he ignored E.M.C. and instead focused on obtaining sex from A.C.-E.

### B. Undue Prejudice and Harmless Error

¶39 I.M. asserts that the sexual misconduct and domestic abuse evidence was unduly prejudicial under WIS. STAT. § 904.03. However, having determined the evidence was relevant, and in light of the overwhelming evidence set forth above regarding I.M.'s abandonment of E.M.C., lack of good cause, and failure to assume

19

parental responsibility, I cannot conclude that the probative value of the challenged evidence was "*substantially* outweighed by the danger of unfair prejudice," as required for exclusion under WIS. STAT. § 904.03. Further, based on this same overwhelming evidence of abandonment and failure to assume parental responsibility, even if the court erroneously exercised its discretion in admitting the challenged evidence, I conclude that any error was harmless. *See, e.g.*, *Martindale*, 246 Wis. 2d 67, ¶30; *Evelyn C.R.*, 246 Wis. 2d 1, ¶28.

### IV. Ineffective Assistance of Counsel

¶40 Parents are entitled to the effective assistance of counsel during TPR proceedings. *Oneida Cty. Dep't of Soc. Servs. v. Nicole W.*, 2007 WI 30, ¶33, 299 Wis. 2d 637, 728 N.W.2d 652; *see also A.S. v. State*, 168 Wis. 2d 995, 1005, 485 N.W.2d 52 (1992) (adopting ineffective assistance of counsel standard for TPR proceedings). The test for ineffective assistance of counsel during TPR proceedings is the same as the two-prong *Strickland*[8] test applicable to criminal cases. *See Nicole W.*, 299 Wis. 2d 637, ¶33. Under *Strickland v. Washington*, 466 U.S. 668 (1984), to show that counsel was ineffective, a parent must demonstrate: that (1) counsel was deficient; and (2) counsel's deficiency prejudiced the parent. *Id.* at 687. Counsel's performance is deficient if it fell outside the "wide range of professional competent assistance." *State v. Pico*, 2018 WI 66, ¶19, 382 Wis. 2d 273, 914 N.W.2d 95 (quoting *Strickland*, 466 U.S. at 690; internal quotation marks omitted). When assessing deficient performance, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 88, (2011); internal quotation marks

---

[8] *See Strickland v. Washington*, 466 U.S. 668 (1984).

omitted). The prejudice prong requires establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, ¶20 (quoting *Strickland*, 466 U.S. at 694; internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (internal quotation marks and quoted source omitted).

¶41 During the trial, A.C.-E. and I.M. offered competing testimony about whether I.M. accompanied A.C.-E. to her prenatal doctor appointments. *See **L.K. v. B.B.***, 113 Wis. 2d 429, 438-39, 335 N.W.2d 846 (1983) (parent's actions prior to child's birth, including interest in prenatal care, are relevant to determining whether a parent has failed to assume parental responsibility). A.C.-E. testified that I.M. did not attend any of her prenatal or postnatal doctor appointments. I.M. testified that he attended some prenatal appointments.

¶42 A.C.-E. introduced a signed letter by her doctor, stating that I.M. was not present at any of the prenatal appointments, nor did the doctor see I.M. at any of the well-child or sick-child appointments. I.M.'s counsel did not object to the introduction of the letter. At the postdisposition hearing, I.M.'s counsel testified that she had agreed with A.C.-E.'s counsel that she would not object to the introduction of the letter; however, she could not recall a reason for this decision.

¶43 On appeal, I.M. argues that his counsel was ineffective for failing to object to the introduction of the letter from A.C.-E.'s doctor because it was inadmissible hearsay. *See* WIS. STAT. § 908.02. He argues that this alleged deficiency was prejudicial because it bolstered A.C.-E.'s testimony that I.M. did not attend any doctor's appointments, thereby supporting A.C.-E.'s claim that I.M. failed to establish a parental relationship with E.M.C. *See* WIS. STAT.

§ 48.415(6)(a) (failure to assume parental responsibility ground is established by showing the parent has not had a "substantial parental relationship" with the child).

¶44    I reject I.M.'s ineffective assistance of counsel claim because I.M. has not demonstrated that the alleged deficiency was prejudicial.[9]  In the context of the entire two-day trial, whatever probative value I.M.'s presence or absence from the doctor visits may have had was *de minimis*.  Accordingly, I.M. has failed to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *See **Pico***, 382 Wis. 2d 273, ¶20 (quoting ***Strickland***, 466 U.S. at 694; internal quotation marks omitted).

## CONCLUSION

¶45    For the reasons set forth above, the circuit court's order is affirmed.

*By the Court.*—Order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[9] Because I conclude that I.M. has not shown that he was prejudiced by his counsel's performance, I do not address whether I.M.'s counsel was deficient.  *See **State v. Mayo***, 2007 WI 78, ¶61, 301 Wis. 2d 642, 734 N.W.2d 115 (reviewing court "need not address both the performance and the prejudice elements, if the defendant cannot make a sufficient showing as to one or the other element").

22